**Marian B. MAPLES, Petitioner–Respondent,**

v.

**DEPARTMENT OF SOCIAL SERVICES, Division of Family Services of State of Missouri, Respondent–Appellant.**

No. 22973.

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 28, 2000.

Motion for Rehearing and Transfer Denied Feb. 17, 2000.

Application for Transfer Denied March 21, 2000.

Bradley S. Hinkle, Dexter, for Appellant.

William G. Todd, Nixa, and John E. Price, Carnahan, Evans, Cantwell & Brown, P.C., Springfield, for Respondent.

KENNETH W. SHRUM, Judge.

The Division of Family Services (DFS) of the Department of Social Services (DSS) discontinued Marian B. Maples's Medical Assistance (Medicaid) Vendor Benefits upon its determination that she was no longer eligible under 42 U.S.C. § 1396r–5, § 208.010, RSMo Cum.Supp. 1998,[1] and 13 C.S.R. 40–2.030(13)(B)(7). Mrs. Maples challenged the decision in administrative proceedings. After a hearing, an Administrative Hearing Officer for the Director of DSS affirmed DFS's decision to terminate Mrs. Maples's benefits. Thereon, Mrs. Maples appealed the agency's decision to the Circuit Court of Christian County pursuant to § 208.100.1, RSMo 1994. The circuit court reversed the agency decision and ordered Mrs. Maples's benefits reinstated, retroactive to the date of termination. DSS appeals the circuit court's judgment. Having reviewed the record, the law, and the agency's decision, we hold that the agency misinterpreted and misapplied the law when it terminated Mrs. Maples's benefits. We affirm the circuit court's judgment reinstating Mrs. Maples's benefits.

**1.** All references to § 208.010 are to RSMo

## FACTS

The facts are undisputed and include the following. On January 31, 1996, Mrs. Maples took up residence in the Balanced Care Nursing Home in Nixa, Missouri, where she occupied a Medicaid-certified bed. In June 1996, Mrs. Maples applied for Medical Assistance (Medicaid) Vendor Benefits. On November 18, 1997, while Mrs. Maples's application for benefits was pending, her husband, Halleck Maples, was institutionalized in the Balanced Care Nursing Home in Nixa. Mr. Maples did not apply for Medical Assistance Vendor Benefits.

In a notice letter dated December 2, 1997, DFS informed Mrs. Maples that her application for benefits had been approved as of June 1, 1997, and that benefits would be paid retroactive to that date. Barely over a week later, in a letter dated December 10, 1997, DFS informed Mrs. Maples of its intent to discontinue her benefits as of December 22, 1997, because Mr. Maples had been institutionalized in the nursing home and the couple's assets, when taken together, exceeded $2,000, the limit for couples' benefits. On December 22, 1997, Mrs. Maples requested an administrative hearing on the termination of her benefits. The agency affirmed DFS's decision to terminate Mrs. Maples's benefits. Mrs. Maples then appealed to the Circuit Court of Christian County. The circuit court reversed the agency's decision and reinstated Mrs. Maples's benefits. DSS appeals.

## STANDARD OF REVIEW

In this case, we review the agency decision, not the judgment of the circuit court. *Hensley v. Missouri Div. of Child Support Enforcement*, 905 S.W.2d 889, 891[3] (Mo.App.1995); *Pummill v. Missouri Div. of Family Services*, 674 S.W.2d 647, 649[1] (Mo.App.1984). Where, as here, the decision of the administrative agency involves the interpretation of law and application of the law to undisputed

Cum.Supp.1998.

facts, we must form our own independent conclusions, and we are not bound by the interpretation of the agency. *Missouri Comm'n on Human Rights v. Red Dragon Restaurant, Inc.*, 991 S.W.2d 161, 165[3] (Mo.App.1999). We give no deference to the agency's or circuit court's conclusions of law but exercise our own independent judgment. *Missouri Ethics Comm'n v. Thomas*, 956 S.W.2d 456, 457[2] (Mo.App. 1997).

## DISCUSSION AND DECISION

■ Mrs. Maples, as the party aggrieved by the agency decision under review, filed the appellant's brief in this court pursuant to Rule 84.05(e).[2] Her sole point relied on states:

> "[THE DEPARTMENT OF SOCIAL SERVICES] ERRED IN DECIDING TO DISCONTINUE MEDICAID VENDOR BENEFITS TO [MRS. MAPLES] ON THE BASIS THAT HER ASSETS EXCEEDED THE MAXIMUM AMOUNT ALLOWED BY LAW, BECAUSE [THE DEPARTMENT OF SOCIAL SERVICES] ERRONEOUSLY INCLUDED ASSETS WHICH WERE THE EXEMPT PROPERTY OF [MRS. MAPLES'S] HUSBAND UNDER THE COMMUNITY SPOUSE RESOURCE ALLOWANCE PROVIDED BY SECTION 208.010.3 RSMo AND STATE REGULATIONS, IN THAT THE HUSBAND'S STATUS AS A NON–IN-STITUTIONALIZED 'COMMUNITY SPOUSE' UNDER THE STATUTE AND REGULATIONS WAS FIXED AS OF JUNE 1, 1997, THE DATE [MRS. MAPLES] QUALIFIED FOR BENEFITS, AND HIS SUBSEQUENT INSTITUTIONALIZATION DOES NOT, AS A MATTER OF LAW, EFFECT [sic] [MRS. MAPLES'S] QUALIFICATION OR THE DETERMINATION OF HER ASSETS FOR PURPOSES OF RECEIVING MEDICAID BENEFITS."

A proper analysis of Mrs. Maples's point begins with the definitions of "institutionalized spouse" and "community spouse." Federal law defines these terms as follows:

> "(1) The term 'institutionalized spouse' means an individual who—
>
> "(A) is in a medical institution or nursing facility . . ., and
>
> "(B) is married to a spouse who is not in a medical institution or nursing facility;
>
> "but does not include any such individual who is not likely to meet the requirements of subparagraph (A) for at least 30 consecutive days.
>
> "(2) The term 'community spouse' means the spouse of an institutionalized spouse."

42 U.S.C. § 1396r–5(h). Missouri law[3] specifically refers to 42 U.S.C. § 1396r–5 for the definition of an "institutionalized

---

**2.** Rule 84.05(e) (1999) provides:

> "(e) Where Circuit Court Reverses a Decision of an Administrative Agency. If the circuit court reverses a decision of an administrative agency and the appellate court reviews the decision of the agency rather than of the circuit court, the party aggrieved by the agency decision shall file the appellant's brief and reply brief, if any, and serve them within the time otherwise required for the appellant to serve briefs. The party aggrieved by the circuit court decision shall prepare the respondent's brief and serve it in a time otherwise required for the respondent to serve briefs."

**3.** The states' relationship to the federal Medicaid program has been described as follows:

> "The Medicaid program was enacted in 1965 as Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, as a jointly financed federal and state program designed to provide health care to needy individuals. A state is not required to participate in the Medicaid program, but if a state elects to participate, the federal government shares the cost if the state's plan complies with the requirements of the Act and the related regulations of the Secretary of Health and Human Services."

*Wahl v. Morton County Soc. Services,,* 574 N.W.2d 859, 863 (N.D.1998). Missouri has opted to participate in the federal Medicaid program. *Dineen v. Missouri State Div. of Family Services*, 697 S.W.2d 564, 566 (Mo. App.1985).

spouse," § 208.010.6, and defines a "community spouse" "as being the noninstitutionalized spouse," § 208.010.11.

It is undisputed that at the time Mrs. Maples first became eligible for benefits in June 1997, she met the definition of an "institutionalized spouse" and her husband, likewise, met the definition of a "community spouse" under both federal and state law. The issue presented in this appeal is whether Mr. Maples's institutionalization after the effective date for which Mrs. Maples was approved to receive benefits justified DFS's termination of her benefits.

Neither the United States Code nor the Revised Statutes of Missouri provides us with a clear answer in this matter. Relevant provisions of § 208.010.6 provide:

"6 . . . . The division [of family services] shall require:

"(1) That *at the beginning* of the period of continuous institutionalization that is expected to last for thirty days or more, the institutionalized spouse, or the community spouse, may request an assessment by the division of family services of total countable resources owned by either or both spouses;

"(2) That the assessed resources of the institutionalized spouse and the community spouse may be allocated so that each receives an equal share;

"(3) That upon an initial eligibility determination, the community spouse's share does not equal at least twelve thousand dollars, the institutionalized spouse may transfer to the community spouse a resource allowance to increase the community spouse's share to twelve thousand dollars;

"(4) That in the *determination of initial eligibility* for the institutionalized spouse, no resources attributed to the community spouse shall be used in determining the eligibility of the institutionalized spouse, except to the extent that the resources attributed to the community spouse do exceed the community spouse's resource allowance as defined in 42 USC section 1396r–5;

. . . .

"(6) That beginning the month *after initial eligibility* for the institutionalized spouse is determined, *the resources of the community spouse shall not be considered available to the institutionalized spouse during that continuous period of institutionalization.*" (Emphasis added.)

The italicized portions above indicate that this provision sets out the prerequisites for the *initial eligibility* of an institutionalized spouse for medical assistance benefits, and the statute makes clear that the community spouse's assets *are not* to be "considered available to the institutionalized spouse" beginning the month after the institutionalized spouse's *initial eligibility is established.*

■■■ Where a statute is plain and unambiguous, appellate courts are afforded no room for interpretation and must give it effect as written. *Brownstein v. Rhomberg–Haglin & Assoc.,* 824 S.W.2d 13, 15[4,5] (Mo.banc 1992). Appellate courts construe statutes only where they are ambiguous. *State ex rel. MHTC v. Alexian Bros.,* 848 S.W.2d 472, 474[3] (Mo.banc 1993).

In this case, § 208.010 lacks plain language explaining how, if at all, Mrs. Maples's eligibility for benefits is affected when her husband enters the nursing home but *does not* apply for medical assistance benefits for himself. Under the circumstances, § 208.010.6 is ambiguous. This follows because reasonably well-informed individuals could read the statute differently. *See Spradlin v. City of Fulton,* 982 S.W.2d 255, 258[2] (Mo.banc 1998). For instance, a reasonably well-informed person reading the definitions of "community spouse" and "institutionalized spouse" in isolation could conclude that Mrs. Maples became ineligible for benefits once her husband became institutionalized because

she was no longer "married to a spouse who is not in a medical institution or nursing facility." *See* 42 U.S.C. § 1396r–5(h)(1). On the other hand, a reasonably well-informed individual reading § 208.010.6(6) in isolation could also decide that, beginning the month after Mrs. Maples became eligible for benefits, Mr. Maples's assets and place of residence should not affect her benefits.

This case appears to be one of first impression as neither party has provided us with any on-point authority concerning this particular issue, and we have found none. Accordingly, we resort to rules of statutory construction to resolve the issue.

■ The ultimate guide when construing an ambiguous statute is the intent of the legislature. *Spradlin,* 982 S.W.2d at 258[3]. The law favors a construction that harmonizes with reason, gives effect to the legislature's intent, and tends to avoid absurd results. *David Ranken, Jr. Technical Inst. v. Boykins,* 816 S.W.2d 189, 192[7] (Mo.banc 1991).

The legislative history of § 208.010.6 cannot be gleaned from an examination of our General Assembly's enactment of § 208.010.6, and no Missouri cases discuss the history of the provision. Nevertheless, Missouri's enactment of § 208.010 was prompted by the omnipresent "federal thumb," which in this instance took the form of the Medicaid program and the Medicare Catastrophic Coverage Act (MCCA).[4] Consequently, an examination of the history of the federal legislation and

an assessment of Congress's intent for the MCCA is beneficial.[5]

*Chambers v. Ohio Dep't of Human Services,* 145 F.3d 793 (6th Cir.1998), *cert. denied,* 525 U.S. 964, 119 S.Ct. 408, 142 L.Ed.2d 331 (1998), summarized the purpose of and the perceived need for the MCCA as follows:

"The objective of the MCCA was to protect married couples when one spouse is institutionalized in a nursing home, so that the spouse who continues to reside in the community is not impoverished and has sufficient income and resources to live independently. *See* H.R. No. 100–105(II), 100th Cong., 2d Sess. at 65 (1988), *reprinted in* 1988 U.S.C.C.A.N. 857, 888. Prior to 1988, Medicaid eligibility rules required couples to deplete their combined resources before the institutionalized spouse was eligible for benefits, often leaving the community spouse financially vulnerable. The MCCA attempted to strike a balance between preventing impoverishment of the community spouse by excluding minimum amounts of resources and income for that spouse from eligibility considerations, and preventing a financially solvent institutionalized spouse from receiving Medicaid benefits by ensuring that income was not completely transferred to the community spouse."

*Id.* at 798.[6]

■ Relative to this case, a persuasive indicator of legislative intent is found in the following passage:

4. The MCCA of 1988, the Medicare Catastrophic Coverage Repeal Act of 1989, and both acts' subsequent amendments are scattered throughout the United States Code. For the sake of simplification, we refer only to 42 U.S.C. § 1396r–5, which deals with treatment of income and resources for certain institutionalized spouses, because that is the only provision at issue in this case.

5. Language in the federal Medicaid law and in the statutes and regulations of states that participate in the Medicaid program has been characterized, *inter alia,* as (1) a "virtually impenetrable 'Serbonian bog,' " *Ross v. Giar-*

*di,* 237 Conn. 550, 680 A.2d 113, 116–17 (Sup.1996), (2) "almost unintelligible to the uninitiated," *Friedman v. Berger,* 547 F.2d 724, 727 n. 7 (2d Cir.1976), and (3) an "aggravated assault on the English language, resistant to attempts to understand it." *Friedman v. Berger,* 409 F.Supp. 1225, 1225–26 (S.D.N.Y.1976).

6. Courts in other jurisdictions have similarly explained the legislative intent underlying the MCCA, including *Wahl,* 574 N.W.2d at 863; *Burinskas v. Dep't of Soc. Services,* 240 Conn. 141, 691 A.2d 586, 589–90 (1997); *Estate of Krueger v. Richland Co. Soc. Services,* 526

"The [MCCA] Committee bill would end spousal impoverishment. It revises the current Federal requirements relating to attribution of income, attribution of resources, transfer of resources, and post-eligibility application of income. These revisions are limited to the context of a couple with *one spouse in an institution who applies for or receives Medicaid.*" (Emphasis added.)

H.R.Rep. No. 100–105(II), at 69 (1988), *reprinted in* 1988 U.S.C.C.A.N. 857, 892. We view this as an expression of Congress's intent that benefit eligibility, once achieved under the MCCA, continues without regard to where the community spouse resides—even if he or she is in a nursing home—so long as the institutionalized spouse is the "one spouse" who "receives Medicaid" and is otherwise eligible. This interpretation gives effect to the legislative objective of avoiding impoverishment of the community spouse. It affords the community spouse with the intended protection until he or she purposefully acts in such a manner as to deprive himself or herself thereof or until the institutionalized spouse is no longer institutionalized. Moreover, this interpretation is practical insofar as it avoids another reshuffling of family resources, a reshuffling that might be impossible if the community spouse has made irrevocable transfers of assets to family members or has otherwise irrevocably committed his or her resources.

Here, only one spouse, Mrs. Maples, was receiving benefits at the time DFS declared her ineligible. Accordingly, we conclude that the Department of Social Services incorrectly interpreted and applied the law in this case. The purpose of preventing the impoverishment of Mr. Maples was best served by continuing Mrs. Maple's benefits even after Mr. Maples was institutionalized.

In reaching that conclusion, we do not ignore DSS's argument that "the definitional status of community spouse and institutionalized spouse play the key role in determining the income and resource eligibility for married couples." However, case law teaches that when, as here, a statute is "loosely drawn, strict meaning and arrangement of individual words or phrases are not as persuasive for purposes of statutory construction as are a reasonable meaning of the words in accordance with the legislative objective." *Beal v. Board of Educ., Laclede County Sch. Dist. R–1,* 637 S.W.2d 309, 311 (Mo.App.1982). Guided by that principle, we refuse to focus solely on the definitional phrases as DSS urges. We remain steadfast in our view that Mrs. Maples was not rendered ineligible solely because Mr. Maples was institutionalized. In so holding, we are ever-mindful that the General Assembly can clarify its intent and correct this interpretation if it so chooses.[7]

The judgment of the trial court is affirmed.

CROW, P.J. and PARRISH, J. concur.

---

N.W.2d 456, 458 (N.D.1994); *Ford v. Iowa Dep't of Human Services,* 500 N.W.2d 26, 27–28 (Iowa 1993)(holding that the MCCA was designed to avoid impoverishing the "community spouse").

7. We note that our decision is constrained to the facts of this case, and we do not decide how, if at all, the parties' status and eligibility for benefits under 42 U.S.C. § 1396r–5 and § 208.010 would be affected if Mr. Maples applied for benefits under these provisions. That issue is not presented by the facts of this case, and we express no opinion with regard thereto. We do not render advisory opinions or decide nonexistent issues. *See In re Marriage of DuBois,* 875 S.W.2d 223, 226[2] (Mo. App.1994).